



0 ͻ      ͻ 1

BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

05 CV 1507

IN RE INTEL x86
MICROPROCESSOR LITIGATION              MDL Docket No. ___1717___

**BRIEF IN SUPPORT PLAINTIFF SUAREZ' MOTION TO
TRANSFER AND CONSOLIDATE OR COORDINATE
FOR PRETRIAL PROCEEDINGS IN THE SOUTHERN
DISTRICT OF CALIFORNIA PURSUANT TO 28 U.S.C. § 1407**

### INTRODUCTION

Plaintiff Justin Suarez in *Suarez v. Intel Corporation*, Case No. 05-CV-1507 (S.D.

Ca.), respectfully moves this Panel, pursuant to 28 U.S.C. § 1407 and Rule 7.2 of the

Rules of Procedure of the Judicial Panel on Multidistrict Litigation, to transfer all

pending and yet-to-be filed federal class actions against Intel Corporation ("Intel"),

alleging anticompetitive conduct or unfair business practices relating to x86

Microprocessors, to the United States District Court for the Southern District of

California.

## BACKGROUND OF THE LITIGATION

1.    This litigation involves Intel's alleged restraint of trade, monopolization, exclusive dealing, and anticompetitive practices, all relating to Intel x86 microprocessors, and brought on behalf of both direct and indirect purchasers of that product and by rival manufacturer, Advanced Micro Devices, Inc. ("AMD") (*Advanced Micro Devices, Inc. vs. Intel Corporation*, No. 1:2005CV00470, D. Del., filed June 27, 2005). Plaintiff Suarez asserts, on behalf of himself and all others similarly situated, that he suffered losses as a result of these practices by Intel.   Suarez asserts claims on behalf a nationwide class of indirect purchasers under California law, the Cartwright Act, Cal. Bus. & Prof. Code Section 16700, et seq., under the principles set forth by the Supreme Court in *Phillips Petroleum Co. v. Shutts* 472 U.S. 797, 105 S.Ct. 2965 (1985) for adjudication of nationwide classes under state law.  Federal jurisdiction is asserted pursuant to 28 U.S.C. Section 1332(d), as the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, and there is a diversity of citizenship between defendant and members of the class.

There are at least 47 other potential class actions against Intel that allege similar conduct on the part of Intel and raise nearly identical issues.  Centralization of pre-trial proceedings is particularly appropriate at this time because all cases are in the early stages.  Therefore, coordination and transfer for consolidation will:

1.    Save substantial time and resources for the parties and the judicial system;

2.    Not delay the proceedings;

3.    Eliminate potential confusion among class members;

4.    Prevent duplication of discovery;

5.    Promote the convenience of the parties and the witnesses; and

6.    Promote the just and efficient resolution of all Related Cases.

Both Intel and AMD have their corporate headquarters in California. Plaintiff Suarez recommends the Southern District of California as the most appropriate transfer forum as it is convenient for the witnesses and the parties, while also free from potential juror local or industry bias.    Given the likelihood of substantive consolidation of the cases, a trial is likely in the transferee forum, thus consideration of *Lexecon Inc. et al . v. Milberg Weiss Bershad Hynes & Lerach* does not appear relevant, while jury considerations remain pertinent. 521 U.S. 1150 (1997).

## ARGUMENT

I.    **THE INTEL x86 MICROPROCESSOR CLASS ACTIONS SHOULD BE TRANSFERRED AND COORDINATED OR CONSOLIDATED FOR PRETRIAL PROCEEDINGS TO AN MDL PROCEEDING IN THE SOUTHERN DISTRICT OF CALIFORNIA**

Section 1407(a) provides that "civil actions involving one or more common questions of fact…may be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a).  Transfer and consolidation are appropriate where they "will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of [the] actions." *Id.*  As explained below, the Intel x86 Microprocessor-related class actions currently pending in the Southern District of California, the Northern District of California and the District of Delaware meet these criteria, as does the action filed against Intel by its competitor, Advanced Micro Devices, Inc. ("AMD"), in the District of Delaware.

The pending actions listed in the Schedule of Actions, attached hereto as Exhibit A, assert common questions of fact, and coordination or consolidation of the related cases against Intel will promote efficiency and convenience for the parties, the witnesses and the courts.  The requirements for transfer and consolidation are thereby

3

satisfied.

### A. The Actions Involve Common Questions of Fact and Law

For transfer to be proper under § 1407(a), the cases at issue must involve "one or more common questions of fact." This requirement is satisfied here, where the actions at issue contain identical allegations of restraint of trade, monopolization, exclusive dealing, and anticompetitive practices, all relating to intel x86 Microprocessors, and brought on behalf of both direct and indirect purchasers of that product and by rival manufacturer, AMD.

In each case here, the factual issues are virtually identical. Each of the complaints contain common allegations arising out of some or all of the following factual issues:

1.      Whether Intel formed and operated an illegal trust in restraint of trade in x86 microprocessors within the Class Period;

2.      Whether Intel unlawfully acquired or maintained or attempted to unlawfully acquire or maintain a monopoly in the production and sale of x86 microprocessors within the Class Period;

3.      Whether Intel engaged in exclusive dealing sales or contracts, agreements or understandings that might substantially lessen competition or tend to create a monopoly in x86 microprocessor chips within the State of California and the United States within the Class Period;

4.      The existence, duration and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of conduct engaged in by Intel;

5.      Whether plaintiff and the plaintiff class sustained antitrust injuries as a result of Intel's conduct within the class period;

6.      The appropriate amount and/or measure of damages; and

7.     The appropriate nature of class wide equitable relief.

The transfer of multiple antitrust actions sharing similar allegations to a single forum under section 1407 is commonplace and proper where, as here, it will prevent duplicative discovery and will eliminate the possibility of inconsistent rulings, including class action determinations by courts of coordinate jurisdiction. *Ford Motor Co. Crown Victoria Police Interceptor Products Liability Litig.*, 229 F. Supp. 2d 1377 (J.P.M.L. 2002) (finding centralization "necessary in order to . . . prevent inconsistent or repetitive pre-trial rulings (such as those regarding class certification) . . .").

The broadly correlative questions of fact and law presented by the Intel x86 Microprocessor-related actions make transfer and consolidation of these cases appropriate. See *In re Beef Indus. Antitrust Litig.*, 419 F. Supp. 720, 721 (J.P.M.L. 1976) (common factual issues concerning alleged antitrust conspiracy necessitated transfer).

### B. Transfer and Coordination or Consolidation Will Further the Convenience of Parties and Witnesses

Transfer and coordination or consolidation for pretrial proceedings of these actions will also serve "the convenience of the parties and witnesses" in accordance with the second requirement of § 1407(a). Defendant Intel is a Delaware corporation headquartered in Santa Clara, California in the Northern District of California. Its primary rival, AMD, initiated these actions by filing a lawsuit in the District of Delaware that brought many of the alleged anticompetitive acts to light. Like Intel, AMD is a Delaware corporation headquartered in the Northern District of California, specifically in Sunnyvale, California.

In contrast to either the District of Delaware or the Northern District of California, a Southern California forum would promote the orderly resolution of claims with neither undue hardship on witnesses nor undue benefit or convenience to the Defendant. Further, the potential jury pool in the Southern District appears more likely to unbiased due to the very pervasiveness of the microprocessor industry in Northern California.

Southern California is home to many computer hardware and microprocessor industry representatives, who are also parties of interest in this case. Many if not all of the already filed Complaints list the Tier One OEMs and refer repeatedly to anticompetitive acts aimed at them. Those companies include: Hewlett-Packard, Dell, IBM/Lenovo, Fujitsu/Siemens, Acer, Toshiba, NEC, Sony and Gateway/eMachines. See, e.g. *Advanced Micro Devices, Inc. vs. Intel Corporation*, No. 1:2005cv00470, D. Del., Compl., pg. 12. Of these potential witnesses, many have a presence in the Southern District of California or in adjacent Orange County, California in the Southern Division of the Central District. For example, within San Diego and Orange Counties: both Hewlett-Packard and Sony maintain large manufacturing and development operations in the San Diego Metro area, Gateway/eMachines, headquartered in San Diego until late 2004, is now located in nearby Irvine, Toshiba's Digital Products and Electronic Components Divisions are also based in Irvine. Located elsewhere in California: Acer's U.S. base of operations is in San Jose, Fujitsu-Siemens Computers USA is located in Sunnyvale, Hitachi Computer Products (America) is headquartered in Brisbane (near South San Francisco), and the NEC Solutions division is based in Rancho Cordova (near

Sacramento).

Southern California is a logistically convenient location for parties located in Northern California, Southern California and elsewhere in the United States. See *In re Worldcom, Inc., Sec. And ERISA Litig,*. 226 F. Supp. 2d 1352, 1355 (J.P.M.L. 2002) (noting that "litigation of this scope will benefit from centralization in a major metropolitan center that is well served by major airlines, provides ample hotel and office accommodations, and offers a well developed support system for legal services"). Frequent flight service is offered into San Diego International Airport, which is located only three miles from the Southern District Courthouse. Accommodations are available at more than 400 hotels and motels in the local area.[1] This is particularly significant when compared to the limited availability of hotels proximate to the U. S. District Courthouse in San Jose. There is no reason to require the parties and counsel to endure either lengthy travel to infrequently served Delaware, or the congestion and inconvenient accommodations common to the San Jose area.

### C. Transfer and Coordination or Consolidation Will Promote Just and Efficient Conduct of These Actions

The choice of San Diego serves the goals of justice and objectivity in judicial proceedings. In contrast to previous causes of action against Intel that have been filed in Northern California, near Intel's Santa Clara headquarters, and in Delaware, where Intel is incorporated. San Diego would provide a forum where the parties could be confident that no hint of Silicon Valley partiality would affect the proceedings. Although Delaware arguably suffers no such issues, it would be logistically difficult

---

[1] San Diego Convention & Visitor's Bureau, *2004 Visitor Industry General Facts*, http://www.sandiego.org/pdf/2004GeneralFacts.pdf

for both witnesses and counsel.

Judicial efficiency is served by the transfer and coordination of these actions to the Southern District of California. Although the Southern District has not traditionally accepted large numbers of MDL cases, five new District Judges have recently been added to the District and caseloads have been stabilized. District Judges have publicly indicated that the Southern District would now entertain MDL proceedings. The goal of efficiency in judicial proceedings would be advanced by the equitable disposition of this MDL case to the Southern District.

II.     THE PANEL SHOULD TRANSFER THESE CASES TO AN MDL
        PROCEEDING IN THE SOUTHERN DISTRICT OF CALIFORNIA

The Southern District of California is the most appropriate jurisdiction for this litigation for five principal reasons. First, California was the jurisdiction chosen by a large number of the plaintiffs filing Intel x86 Microprocessor class action complaints. Second, a number of the complaints, including AMD's and Suarez', allege violations of California law. Third, witnesses within the high-tech industry have a significant presence in Southern California. Fourth, the Southern District offers an advantage over the Northern District due to the avoidance of factors based on location. Indeed, in the event of a trial it would appear that a Southern District jury might be easier to seat due to the very pervasiveness of the microprocessor industry in Northern California. Fifth, the equitable distribution of cases within the District Courts favor the transfer of these cases to the Southern District. Finally, "while it is unquestionably true that other districts would be more convenient for individual (parties), we 'must weight the interests of all of the (parties) and must consider multiple litigation as a whole in light of the purpose of the law.'" *In re Master Key*,

320 F.Supp. 1404, 1406 (J.P.M.L. 1971), citing *In re Children's Books Litigation*,

297 F.Supp. 385 (J.P.M.L. 1968).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Panel order the

transfer and coordination or consolidation of all pending and yet-to-be filed Intel x86

Microprocessor federal class actions to an MDL proceeding in the Southern District

of California.

DATED: August 3, 2005                Respectfully submitted,

Michael L. Kirby
Jonathan A. Boynton
**POST KIRBY NOONAN & SWEAT LLP**
600 West Broadway, Ste. 1100
San Diego, CA 92101
Telephone:    (619) 231-8666
Facsimile:    (619) 231-9593


Daniel J. Mogin
Lisa J. Frisella
Chad M. McManamy
**THE MOGIN LAW FIRM, P.C.**
110 Juniper Street
San Diego, CA 92101-1502
Telephone:    (619) 687-6611
Facsimile:    (619) 687-6610
Attorneys for Plaintiff Justin Suarez

# EXHIBIT 1

1  Michael L. Kirby (50895)
   Jonathan A. Boynton (174910)
2  **POST KIRBY NOONAN & SWEAT LLP**
   One America Plaza
3  600 West Broadway, Suite 1100
   San Diego, California 92101-3387
4  Telephone (619) 231-8666
   Facsimile (619) 231-9593
5
   Daniel J. Mogin (95624)
6  Lisa J. Frisella (216504)
   Chad M. McManamy (225205)
7  **THE MOGIN LAW FIRM, P.C.**
8  110 Juniper Street
   San Diego, CA 92101-1502
9  Telephone: (619) 687-6611
   Facsimile: (619) 687-6610
10
   Attorneys for Plaintiffs
11
12               **UNITED STATES DISTRICT COURT**

13               **SOUTHERN DISTRICT OF CALIFORNIA**

14  JUSTIN SUAREZ on behalf of himself      CASE NO.
    and all others similarly situated,
15                                          **CLASS ACTION COMPLAINT**
              Plaintiffs,
16
         vs.
17
    INTEL CORPORATION, a Delaware
18  corporation,

19            Defendants.

20

21      Plaintiff Justin Suarez ("Plaintiff") brings this action individually and on behalf of

22  all other individuals and/or entities ("persons") similarly situated. The Class that

23  Plaintiff seeks to represent consists of all persons who indirectly purchased x86

24  microprocessor chips produced by Intel Corporation ("Intel") including end-products

25  such as personal computers (PC) incorporating such microprocessors during the

26  Class period, as defined below,  Plaintiff, by its attorneys, complains of the

27  Defendant, upon information and belief, except those paragraphs that allege personal

28  knowledge as follows:

PKNS\381148.1

CLASS ACTION COMPLAINT

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

## INTRODUCTION

1.    Pursuant to 28 U.S.C. section1332 (d), Plaintiff brings this action as a Nationwide Class Action under California law on behalf of all "persons," as defined in California Business & Professional Code ("Cal. Bus. & Prof. Code") section 16702, who indirectly purchased Intel x86 microprocessor chips, including those who purchased end-products such as personal computers ("PC") containing such Intel microprocessor chips for their own use and not for re-sale, and a thereby paid artificially high supra-competitive prices as a result of Intel's anti-competitive conduct.

2.    Intel holds a monopoly in microprocessors that run the Microsoft Windows and Linux families of operating systems (hereinafter the "x86 Microprocessor Market").  Intel possesses market power, with its microprocessor revenues accounting for approximately 90% of the worldwide total dollar of microprocessor sales (and 80% of the microprocessor units sold).

3.    For over a decade, Intel has unlawfully maintained its x86 microprocessor monopoly by engaging in a relentless campaign to coerce customers to refrain from dealing with its competitors.  Among other things,

•    Intel has forced major customers into exclusive or near-exclusive deals;

•    Intel has conditioned rebates, allowances, and market development funding on its customers' agreement to severely limit or forego entirely purchases from Intel's competitors;

•    Intel has established a system of discriminatory, retroactive, first-dollar rebates triggered by purchases at such high levels as to have the practical and intended effect of denying its customers the freedom to purchase any significant volume of microprocessors from Intel's competitors;

•    Intel has threatened retaliation against customers, particularly in strategic market segments;

/ / /

/ / /

1    •    Intel has established and enforced quotas among key retailers effectively

2  requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers,

3  thereby artificially limiting consumer choice;

4    •    Intel has forced PC makers and technology partners to boycott Intel's

5  competitors' product launches and promotions; and

6    •    Intel has abused its market power by forcing on the industry technical

7  standards and products in a manner which has, as its central purpose, the

8  handicapping of its competitors in the marketplace.

9    4.    End-users or consumers, including Plaintiff and the other members of

10  the Class, have been damaged by Intel's unlawful conduct in the form of supra-

11  competitive prices for personal computers and other products containing

12  microprocessors resulting from Intel's raising and fixing of the prices of its

13  microprocessor chips incorporated therein, and the loss of freedom to purchase

14  computer products and other products that best fit their needs.

## JURISDICTION

16    5.    This Court has jurisdiction pursuant to 28 U.S.C. section 1332(d), as the

17  amount of controversy exceeds the sum or value of $5 million, exclusive of interest

18  and costs, and there is a diversity of citizenship between Defendant and Members of

19  the Class as the Class consists of persons of all 50 states.

## VENUE

21    6.    Venue is proper in this Court pursuant to 28 U.S.C. section 1391(a)

22  because Intel conducts business in San Diego County, is subject to personal

23  jurisdiction in San Diego County, and the acts and transactions given rise to the

24  violations complained of herein, and the Classes' damages, occurred in substantial

25  part in this county.  Venue is also proper pursuant to Cal. Bus. & Prof. Code section

26  16750(a) because Intel is found, or its agent resides or is found, in San Diego County,

27  and service may be obtained there.

28  ///

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

## PARTIES

7.    Plaintiff Justin Suarez is a resident of San Diego, California who purchased a Dell Inspiron 8600 laptop computer in San Diego containing an Intel Centrino microprocessor chip in approximately March 2004, for his own use and not for re-sale, paying a supra-competitive price as a result of Intel's conduct as alleged herein and was thereby injured in his business or property.

8.    Defendant Intel Corporation is a Delaware corporation with its principal place of business in Santa Clara, California.  At all times relevant hereto, Intel was engaged, either individually or with others, in the business of manufacturing, marketing or selling Intel x86 Microprocessor Chips to the public throughout the United States and within the State of California.

## AGENCY, JOINT VENTURE, ALTER EGO AND CO-CONSPIRATORS

9.    Intel acted as the agent, joint venturer, alter ego, or co-conspirator of or for the others both known and unknown, with respect to the acts, violations, and common course of conduct alleged herein.

10.    The acts charged in this Complaint as having been accomplished by Defendant or its agents, joint venturers, alter egos, or co-conspirators were authorized, ordered, ratified or accomplished by their officers, agents, employees, or representatives, while actively engage in the management of the Defendant's business or affairs.

## CLASS ACTION ALLEGATIONS

11.    Plaintiff brings this action as a class action, pursuant to Rules 23(a) and (b) (3) of the federal rules of Civil Procedure.  The Class that Plaintiff seeks to represent is defined as:

> All persons residing in the United States who purchased Intel x86 microprocessor chips, indirectly from defendants, including end-products such as personal computers containing such Intel x86 microprocessor chips in the United States for their own use and not for resale from January 1, 1997, through the date of Class Notice (hereinafter "Class Period").  Specifically excluded from the

Plaintiff Class is the defendant herein; officers, directors, or employees of the defendant; any entity in which the defendant has a controlling interest; the affiliates, legal representatives, attorneys, heirs or assigns of the defendant. Also excluded are any federal, state or local governmental entities. Further excluded are and any judge, magistrate judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staffs.

12.    Applying California law and, in particular, California's Cartwright Act, Cal. Bus. & Prof. Code §16700, et seq., to Intel's conduct in this matter on behalf of a Nationwide Class is neither arbitrary nor fundamentally unfair.  Intel has its principal of place of business in California and the conduct described herein was directed from California.  Moreover, one of the primary targets of Intel's anticompetitive practices, and its rival, AMD, who revealed Intel's anti-competitive conduct is also located in California.  California is also the center of the PC industry in the United States and California consumers represent a disproportionately high percentage of the Plaintiff Class; it is believed that as much as 20-25% of all PC related transactions within United States take place, in substantial part, in California.  As such, California has a significant state interest in applying its law to Intel's wrongful conduct.  See Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985).

**A. Numerosity**

13.    The Members of the Class are so numerous that joinder of all members is impracticable.  Plaintiff is informed and believes, based upon the nature and amount of trade and commerce in x86 microprocessors, and thereon alleges that there are millions of Members of the Nationwide Class.

**B. Typicality**

14.    Plaintiff's claims are typical of the claims of the members of the Plaintiff Class because Plaintiff and each Member of the Plaintiff Class purchased, indirectly, Intel x86 microprocessor chips for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of Defendant's common course of conduct in violation of law as alleged herein.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

### C. Adequacy of Representation

15.    Plaintiff will fairly and adequately protect the interests of the members of the Plaintiff Class. Plaintiff resides in California, is an indirect purchasers and end-user of an Intel x86 microprocessor chip and indirectly purchased, in California, an Intel x86 microprocessor chip in a PC during the Class Period for his own use and not for resale, and thus is an adequate representative of the Plaintiff Class. Plaintiff has no interests that are adverse to the interests of absent class members. Plaintiffs have retained counsel with substantial experience in the prosecution of complex class action antitrust and consumer protection litigation.

### D. Superiority

16.    A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members of the Plaintiff Class is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the monetary injuries suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them. Additionally, an important public interest will be served by addressing the matter as a class action. The cost to the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

### E. Manageability

17.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action as plaintiff seeks the application of the law of a single state.

/ / /

1

### F. Common Questions of Law and Facts

2      18.    Common questions of law and fact exist with respect to all Members of

3  the Class and predominate over any questions effecting solely individual members of

4  the Class.  Among the common questions or law and fact, are the following:

5          (a)    Whether defendant formed and operated an illegal trust in

6  restraint of trade in x86 microprocessors within the Class Period;

7          (b)    Whether defendant unlawfully acquired or maintained or

8  attempted to unlawfully acquire or maintain a monopoly in the production and sale of

9  x86 microprocessors within the Class Period;

10          (c)    Whether defendant engaged in exclusive dealing sales or

11  contracts, agreements or understandings that might substantially lessen competition

12  or tend to create a monopoly in x86 microprocessor chips within the State of

13  California and the United States within the Class Period;

14          (d)    The existence, duration, and illegality of the restrictions,

15  limitations, obligations, conditions, agreements, understandings, trusts and course of

16  conduct alleged herein;

17          (e)    Whether Plaintiff and the Plaintiff Class sustained antitrust injury

18  as a result of defendant's conduct within the Class Period;

19          (f)    The appropriate amount and/or measure of damages; and

20          (g)    The appropriate nature of class wide equitable relief.

21      19.    Further, Defendant has acted on grounds generally applicable to the

22  entire Class, thereby making final injunctive relief and ancillary equitable relief

23  appropriate with respect to the Class as a whole.

24

### FACTUAL BACKGROUND

25      20.    Intel's largest competitor, AMD, set forth much of the history and

26  anticompetitive conduct by Intel in its complaint filed on or about June 27, 2005:

27  ///

28  ///

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1 *Early History*

2     21.    The brain of every computer is a general-purpose microprocessor, an

3 integrated circuit capable of executing a menu of instructions and performing

4 requested mathematical computations at very high speed. Microprocessors are

5 defined by their instruction set – the repertoire of machine language instructions that

6 a computer follows. So, too are computer operating systems – software programs

7 that perform the instructions in the set allowing the computer to perform meaningful

8 tasks. The first generation of microprocessors, which were capable of simultaneously

9 handling 4 and then later 8 bits of data, evolved to provide 16-bit capability (the

10 original DOS processors), then sometime later a 32-bit capability (allowing the use of

11 advanced graphical interfaces such as later versions of the Microsoft Windows

12 operating system), and now 64-bit capability.

13     22.    When IBM defined the original PC standards in the early 1980s, it had

14 available to it a variety of microprocessors, each with its own instruction set. Among

15 those where microprocessors developed by Motorola, Zilog, National Semiconductor,

16 Fairchild, Intel, and AMD. IBM opted for the Intel architecture, which utilized what

17 became known as the x86 instruction set (after Intel's naming convention for its

18 processors, i.e., 8086, 80186, 80286, 80386), and a compatible operating system

19 offered by Microsoft, known as DOS.

20     23.    Unwilling to be consigned to a single source of supply, however, IBM

21 demanded that Intel contract with another integrated circuit company and license it to

22 manufacture the x86 chips as a second source. AMD, which had worked with Intel

23 before in supplying microprocessors, agreed to abandon its own, competing

24 architecture, and undertook to manufacture x86 chips as a second source of supply

25 for IBM. Assured that it would not be dependent upon a monopoly supplier of x86

26 chips, IBM introduced the PC in August 1981 – and its sales of those computers

27 exploded.

28 / / /

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

24.    Although an arbitrator later found that "AMD's sponsorship helped propel Intel from the chorus line of semiconductor companies into instant stardom," Intel soon set out to torpedo the 1982 AMD-Intel Technology Exchange Agreement (the "Agreement") by which each would serve as a second source for products developed by the other.  For example, Intel was required by the Agreement to send AMD timely updates of its second generation 80286 chip.  Instead, in a "deliberate" effort "to shackle AMD's progress," Intel sent AMD information "deliberately incomplete, deliberately indecipherable and deliberately unusable by AMD engineers," according to the arbitrator.  The conduct was, in the arbitrator's words, "inexcusable and unworthy."  Moreover, this conduct was not isolated. Intel elsewhere tried to "sabotage" AMD products, engaged in "corporate extortion" and demonstrated a near-malevolent determination "to use all of its economic force and power on a smaller competitor to have its way."

25.    In 1984, in another underhanded effort to stifle AMD's business, Intel decided that notwithstanding the Agreement, Intel would become the sole source for the promising 80386 chip.  To fully realize its objective, Intel engaged in a scheme to mislead AMD and the public into erroneously believing that AMD would be a second source for this chip product, thereby keeping AMD in the Intel "competitive camp" for years.

26.    This strategy served a broader purpose than simply preventing AMD from competing with Intel.  Customers' perception that AMD would continue to serve as Intel's authorized second source was essential to Intel's aim of entrenching the x86 family of microprocessors as the industry standard — just as it had been essential to IBM's original introduction of the PC.  Intel was well aware that if computer manufacturers knew Intel intended to sole source its 32-bit product, they would be motivated to select alternative products produced by companies offering second sources.  Intel could not preserve the appearance that AMD would second source the 386 if it terminated the contract or otherwise disclosed its actual intent.  Thus, Intel

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1 stalled negotiations over product exchanges, while at the same time allowing AMD to

2 believe that it could ultimately obtain the 386. This injured competition by deterring

3 and impeding serious competitive challenges to Intel and directly injured AMD by

4 depriving it of the revenues and profits it would have earned from such a challenge.

5      27.    Intel implemented this secret plan for the purpose of acquiring and

6 maintaining an illegal monopoly in the x 86 lines of microprocessors, which it did by at

7 least 1987. As was its plan, Intel's conduct drained AMD's resources, delayed AMD's

8 ability to reverse-engineer or otherwise develop and manufacture competitive

9 products, and deterred AMD from pursuing relationships with other firms. In so doing,

10 Intel wrongfully secured the benefit of AMD's marketing skills and talent in support of

11 the x 86 lines of microprocessors and related peripherals and secured the benefit of

12 substantial competitively sensitive AMD information regarding its product

13 development plans. When AMD petitioned to compel arbitration in 1987 for Intel's

14 beach and bad faith, the arbitrator took notice of Intel's anticompetitive design: "In

15 fact, it is no fantasy that Intel wanted to blunt AMD's effectiveness in the

16 microprocessor marketplace, to effectively remove AMD as at competitor."

17      28.    In 1992, after five years of litigation, the arbitrator awarded AMD more

18 than $10 million in damages, prejudgment interest, and a permanent, nonexclusive

19 and royalty-free license to any Intel intellectual property embodied in AMD's own 386

20 microprocessor, including the x86 instruction set. Confirmation of the award was

21 upheld by the California Supreme Court two years later. In bringing the litigation to a

22 close, the arbitrator hoped that by his decision, "the competition sure to follow will be

23 beneficial to the parties through an expanded market with appropriate profit margins

24 and to the consumer worldwide through lower prices."

25 *AMD Moves From Second Source To Innovator*

26      29.    Shortly after confirmation of the award, AMD settled its outstanding

27 disputes with Intel in a 1995 agreement which gave AMD a shared interest in the x86

28 instruction set, but required AMD to develop its own architecture to implement those

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1 instructions. The settlement also had the unintended benefit of forcing AMD to

2 reinvent itself. Beginning in the late 1990s, AMD committed its resources to

3 innovation and differentiation. Going its own way proved beneficial: AMD's first x86

4 chip without Intel pin-compatibility, the Athlon microprocessor, delivered in 1999,

5 marked the first (but not last) time AMD was to leapfrog Intel technologically and beat

6 it to market with a new generation Windows microprocessor (and to break the I GHz

7 speed barrier in the process).

8      30.     Four years later, AMD introduced an extension of x86 architecture that

9 took Windows processors into the realm of 64-bit computing. Unlike Intel, which

10 invested billions in its Itanium microprocessor and a new, unique 64-bit proprietary

11 instruction set (which, because it was proprietary, would have been a game-ending

12 development for AMD had it become the industry standard), AMD undertook to

13 supplement the x86 instructions to accommodate 64-bit processing while allowing 32-

14 bit software to be run as well. AMD's efforts culminated in April 2003 when it brought

15 to market its Opteron microprocessor for servers (the workhorse computers used by

16 businesses to run corporate networks, e-commerce websites, and other high-end,

17 computationally-intense applications). Opteron was the industry's first x86 backward

18 compatible 64-bit chip. Six months later, AMD launched the Athlon64, a backward

19 compatible 64-bit microprocessor for desktops and mobile computers.

20      31.     The computing industry hailed AMD's introduction of 64-bit computing as

21 an engineering triumph. Said Infoworld its August 27, 2004 issue,

22      You just gotta love a Cinderella story. . . . AMD's rapid rise
     from startup to $5 billion semiconductor powerhouse is, as
23      Humphrey Bogart's English teacher once said, the stuff of
     which dreams are made. . . . In the process, AMD has
24      become known as the company that kept Intel honest, the
     Linux of the semiconductor world. . . . After decades of
25      aping Intel architectures, the AMD64 architecture, rooted in
     Opteron and Athlon 64 processors, has actually been
26      imitated by Intel in the form of Nocona, Intel's 64-bit version
     of Xeon. In a stunning reversal of fortune, Intel was forced
27      to build that chip because Opteron was invading a server
     market that the Intel titanium was supposed to dominate.

28

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

32.    In what represented a paradigm shift in the microprocessor world, Microsoft endorsed AMD's 64-bit instruction set and announced that Windows would support it.  As noted by InfoWorld, Intel then copied AMD's technology for its own 64-bit offerings — an event that confirmed AMD's technological emergence.

33.    AMD has since extended its AMD64 technology to the balance of AMD's microprocessor line-up (which now includes AMD Athlon 64, AMD Athlon 64 FX, Mobile, AMD Athlon 64, AMD Sempron, and AMD Turion64 products).  Owing also to AMD's innovations in dual-core processors and its introduction of an improved architecture that speeds up microprocessor communications with memory and input/output devices, AMD has advanced as a technological leader in the microprocessor industry.  Its innovation has won for it over 70 technology leadership and industry awards and, in April 2005, the achievement of being named Processor Company of 2005" at, an Intel-sponsored industry awards show.

34.    Tellingly, however. AMD's market share has not kept pace with its technical leadership.  Intel's misconduct is the reason.  Intel has unlawfully maintained its monopoly and has systematically excluded AMD and other competitors from any meaningful opportunity to compete for market share by preventing the companies that buy chips and build computers from freely deploying processors sold by AMD and other competitors; by relegating AMD and other competitors to the low-end of the market; by preventing AMD and other competitors from achieving the minimum scale necessary to become a full-fledged, competitive alternative to Intel; and by erecting impediments to competitors' ability to increase productive capacity for the next generation of microprocessors.

35.    In addition to AMD, no other chip manufacturer has been able to successfully compete with Intel as a result of its anti-competitive acts as described herein.

///

///

PKNS\381148.1

# THE x86 PROCESSOR INDUSTRY

## Competitive Landscape

36.    The x86 versions of Windows and Linux, the two operating systems that dominate the business and consumer computer worlds, have spawned a huge installed base of Windows- and Linux-compatible application programs that can only run on the x86 instruction set. This has given Intel effective ownership of personal computing. Although other microprocessors are offered for sale, the non-x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

37.    The relevant product market is x86 Microprocessors, because a putative monopolist in this market would be able to raise the prices of x86 Microprocessors above a competitive level without losing so many customers to other microprocessors as to make this impractical. While existing end-users can theoretically shift to other operating-system platforms, high switching costs associated with replacing existing hardware and software make this impractical. Further, the number of new, first-time users who could choose a different operating-system platform is too small to prevent an x86 Microprocessor Chip monopolist from imposing a meaningful price increase for a non-transitory period of time. Computer manufacturers would also encounter high switching costs in moving from x86 Microprocessor Chips to other architectures and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 Microprocessor Chips and other microprocessors at the competitive level.

38.    The relevant geographic market for x86 microprocessors is essentially worldwide. Intel and its competitors compete globally; PC platform architecture is the same from country to country; microprocessors can be, and frequently are, easily and inexpensively shipped around the world; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA.
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

39.    Intel dominates the worldwide x86 Microprocessor Market.  According to published reports, over the past several years, Intel has consistently achieved more than a 90% market share measured by revenue, while AMD's revenue share has remained at approximately 9%, with all other microprocessor manufacturers relegated to approximately 1%.  Intel has captured at least 80% of x86 Microprocessor Chips sales in seven of the last eight years.  Since 1999, AMD's worldwide volume share has hovered at 15%, only once penetrating the 20% level.  The following chart illustrative:

### x86 Worldwide CPU Unit Market Share

|        | 1997  | 1998  | 1999  | 2000   | 2001  | 2002  | 2003  | 2004  |
|--------|-------|-------|-------|--------|-------|-------|-------|-------|
| Intel  | 85.0% | 80.3% | 82.2% | 82.2%  | 78.7% | 83.6% | 82.8% | 82.5% |
| AMD    | 7.3%  | 11.9% | 13.6% | 12.6.% | 20.2% | 14.9% | 15.5% | 15.8% |
| Others | 7.5%  | 7.9%  | 4.2%  | 1.1%   | 1.1%  | 1.4%  | 1.7%` | 1.7%  |

40.    Intel's x86 family of microprocessors no longer faces any meaningful competition other than from AMD.  National Semiconductor acquired Cyrix in 1997 but shuttered it less than two years later.  At the beginning of this year only two other x86 chip makers remained - Via Technologies, Inc. and Transmeta Corporation – which together account for less than 2% of the market.  Transmeta has since announced its intention to cease selling x86 microprocessors, and Via faces dim prospects of growing its market share to a sustainable level.

***Customers For x86 Microprocessors***

41.    Intel is shielded from new competition by huge barriers to entry.  A chip fabrication plant ("fab") capable of efficiently mass-producing x86 microprocessors carries a price tag of at least $2.5 to $3.0 billion.  In addition, any new market entrant would need the financial wherewithal to underwrite billions more in research and development costs to design a competing x86 microprocessor and to overcome almost insurmountable IP and knowledge barriers.

/ / /

42. Annual worldwide consumption of x86 Microprocessor Chips currently stands at just over 200 million units per year and is expected to grow by 50% over the remainder of the decade. Relatively few microprocessors are sold for server and workstation applications (8.75 million in 2004), but these command the highest prices. Most x86 Microprocessor Chips are used in desktop PCs and mobile PCs, with desktops currently outnumbering mobiles by a margin of three to one. Of the total worldwide production of computers powered by x86 Microprocessor Chips, 32% are sold to U.S. consumers: U.S. sales of AMD-powered computers account for 29% of AMD's production; California accounts for as much as 20-25% of end-users.

43. The majority of x86 Microprocessor Chips are sold to a handful of large OEMs (original equipment manufacturers), highly visible companies recognized throughout the world as the leading computer makers. Regarded by the industry as "Tier One" OEMs over most product categories are: Hewlett-Packard ("HP"), which now also owns Compaq Computer; Dell, Inc.; IBM, which as of May 1, 2005, sold its PC (but not server) business to Lenovo; Gateway/eMachines; and Fujitsu/Fujitsu Siemens, the latter a Europe-based joint venture. Toshiba, Acer, NEC and Sony are also commonly viewed as Tier One OEMs in the notebook segment of the PC market. HP and Dell are the dominant players, collectively accounting for over 30% of worldwide desktop and mobile sales, and almost 60% of worldwide server sales. Both are U.S.-based companies, as are IBM and Gateway/eMachines; and all but Gateway have U.S. manufacturing operations (as does Sony, which operates a North American production facility in San Diego).

44. Worldwide, the Tier One OEMs collectively account for almost 80% of servers and workstations (specialty high-powered desktops), more than 40% of worldwide desktop PCs, and over 80% of worldwide mobile PC's. According to industry publications, unit market share in 2004 among the Tier One OEMs was as follows:

///

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

OEM Market shares – 2004

| Company | Server/WS | Desktop | Mobile |
|---|---|---|---|
| Hewlett-Packard | 29.86% | 13.69% | 16.23% |
| Dell | 28.34% | 16.18% | 17.27% |
| IBM/Lenovo | 14.46% | 3.69% | 9.20% |
| Fujitsu/Siemens | 3.70% | 2.83% | 6.88% |
| Acer | 0.81% | 1.85% | 8.53% |
| Toshiba | 0.31% | 0.05% | 12.73% |
| NEC | 2.06% | 2.02% | 4.50% |
| Sony | -- | 0.76% | 4.23% |
| Gateway/eMachines | 0.16% | 2.48% | 1.45% |
| Total | 79.70% | 43.55% | 81.02% |

45.    The balance of x86 production is sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers, and other, smaller distributors.

46.    OEMs have adopted a variety of business models, including direct sales to customers through web-based e-commerce, sales through company-employed sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent distributors (who focus on smaller business customers). With the exception of Dell, which markets to consumers only directly (mostly over the Internet), most OEMs also sell their products through retail chains. Intel and its competitors compete not only to have OEMs incorporate their microprocessors into their retail platforms but also to convince retailers to allocate shelf-space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

47.    Through its economic muscle and relentless marketing – principally its "Intel Inside" and "Centrino" programs, which financially reward OEMs for branding their PCs as Intel machines – Intel has transformed the OEM world. While once

1   innovative companies themselves, the OEMs have largely become undifferentiated

2   distributors of the Intel platform, offering "Intel Inside" and "Centrino" computers

3   largely indistinguishable from those of their rivals. As their products have become

4   commoditized, the Tier One OEMs operate on small or negative margins and the

5   overwhelming portion of PC profit flows to Intel.

6       48.     This profit drain has left OEMs and others in the distribution chain in a

7   quarter-to-quarter struggle to eke out even a modest return on their assets, thereby

8   making them continually susceptible to Intel's economic coercion, which is described

9   below.

10                      **INTEL'S UNLAWFUL PRACTICES**

11      49.     Intel has maintained its x86 microprocessor monopoly by deploying a

12  host of financial and other exclusionary business strategies that in effect limit its

13  customers' ability or incentive to deal with Intel's competitors. Although differing from

14  customer to customer and segment to segment, the Intel arsenal includes direct

15  payments in return for exclusivity and near-exclusivity; discriminatory rebates,

16  discounts and subsidies conditioned on customer "loyalty" that have the practical and

17  intended effect of creating exclusive or near-exclusive dealing arrangements; threats

18  of economic retaliation against those who give, or even contemplate giving, too much

19  of their business to Intel's competitors; and misuse of industry standards-setting

20  processes so as to disadvantage competitors' products in the marketplace, thus

21  increasing costs to consumers of x86 Microprocessor Chips and products containing

22  such chips – including those purchased by Plaintiff and the other members of the

23  Class.

24      50.     Intel's has targeted both U.S. and offshore customers at all levels to

25  prevent competitors from building market share anywhere, with the goal of stifling

26  competitors and keeping Intel's customers dependent on Intel for very substantial

27  amounts of product. In this way, OEMs remain vulnerable to continual threats of lintel

28  retaliation, competitors remain capacity-constrained, the OEMs remain Intel-

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1    dependent, and Intel thereby perpetuates its economic hold over them, allowing it to

2    continue to demand that customers curtail their dealings with competitors. The cycle

3    repeats itself: by unlawfully exploiting its existing market share, Intel impedes the

4    growth of competitors, thereby laying a foundation for the next round of foreclosing

5    actions with the effect that competitors' ability to benefit from their current

6    technological advances is curtailed to the harm of consumers – including Plaintiff and

7    the other members of the Class.

8                    **1)**    **Practices Directed At OEMs**

9                         **a.**    **Exclusive and Near-Exclusive Deals**

10        51.    **Dell.** In its history, Dell has not purchased a single AMD x86

11   Microprocessor Chip despite acknowledging Intel's shortcomings and customers'

12   requests for AMD solutions, principally in the server sector. As Dell's President and

13   CEO, Kevin Rollins, publicly stated in February 2005:

14                    Whenever one of our partners slips on either the economics
                     or technology, that causes us great concern. . . . For a
15                    while, Intel admittedly slipped technologically and AMD had
                     made a step forward. We were seeing that in customer
16                    response and requests.

17        52.    Nonetheless, Dell has been and remains Intel-exclusive. According to

18   industry reports, Intel has secured Dell's exclusivity with outright payments and

19   favorable discriminatory pricing and service. In discussions about buying from AMD,

20   Dell executives have conceded that they must financially account for Intel retribution

21   in negotiating pricing from AMD.

22        53.    **Sony.** With the introduction of its Athlon microprocessor in 1999, AMD

23   began to make notable inroads into Intel's sales to major Japanese OEMs, which

24   export PCs internationally including into California and the U.S. By the end of 2002,

25   AMD had achieved an overall market share of approximately 22% to the major

26   Japanese OEMs. To reverse the erosion of its business, in 2003 Intel paid Sony

27   multi-million dollar sums, disguised as discounts and promotional support, in

28   exchange for absolute microprocessor exclusivity. Sony abruptly cancelled an AMD

1  Mobile Athlon notebook model. Soon thereafter, it cancelled plans to release AMD
2  Athlon desktop and notebook computers. As a result, AMD's share of Sony's
3  business dropped from 23% in 2002 to 8% in 2003, and then to 0%, where it remains
4  today. In proceedings brought by the Japanese Fair Trade Commission ("JFTC"),
5  Intel has failed to contest the JFTC charges of misconduct with respect to Sony.

6      54.   **Toshiba.** Like Sony, Toshiba was once a significant AMD customer, but
7  also like Sony, Toshiba received a very substantial payment from Intel in 2001 not to
8  use AMD processors. Toshiba thereupon dropped AMD. Its executives agreed that
9  Intel's financial inducements amounted to "cocaine," but said they were hooked,
10 because reengaging AMD would jeopardize Intel market development funds
11 estimated to be worth $25-30 million per quarter to Toshiba. Toshiba made clear to
12 AMD that the tens of millions of dollars of additional marketing support was provided
13 on the explicit condition that Toshiba could not use AMD microprocessors. In
14 proceedings brought by the JFTC, Intel has accepted the JFTC charges of
15 misconduct with respect to Toshiba.

16     55.   **NEC.** AMD also enjoyed early success with NEC, capturing nearly 40%
17 of its microprocessor purchases for notebooks and desktops in the first quarter of
18 2002. In May 2002, however, Intel agreed to pay NEC more than three billion yen per
19 quarter in exchange for caps on NEC's purchases from AMD. The caps assured Intel
20 at least 90% of NEC's business in Japan, and they established an overall worldwide
21 quota on NEC's AMD dealings. The impact was immediate. While AMD had
22 maintained an 84% share of NEC's Japanese consumer desktop business in the third
23 quarter of 2002, after the payments, AMD's share quickly plummeted to virtually zero
24 in the first quarter of 2003. NEC has made clear to AMD that its Japanese share
25 must stay in the single digits pursuant to NEC's agreement with Intel. Worldwide,
26 AMD's share dipped from nearly 40% to around 15%, where it stands today. In
27 proceedings brought by the JFTC, Intel has accepted the JFTC charges of
28 misconduct with respect to NEC.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

56.    **Fujitsu.** In the summer of 2002, Fujitsu informed AMD that Intel had pressured Fujitsu to remove Fujitsu's AMD-powered desktop models from Fujitsu's website. Fujitsu complied by making any potential AMD buyer click past Intel products to get to the AMD offerings. Then, in early 2003, Intel moved to lock up an even greater share of Fujitsu's business. Intel offered an undisclosed package of financial incentives to Fujitsu in return for Fujitsu's agreement to restrict its dealings with AMD. Fujitsu's catalog currently limits AMD to a single notebook product. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Fujitsu.

57.    **Hitachi.** According to the JFTC, Intel has also purchased an exclusive-dealing arrangement with Hitachi, which had been a substantial AMD customer. The agreement caused AMD's Hitachi business to fall precipitously. For example, during the first part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter. But by the middle of the year, AMD sold no microprocessors to Hitachi at all. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Hitachi.

58.    **Gateway/eMachines.** From 2001 to 2004, Gateway was exclusively Intel – which was not the case prior to that time. In 2001 former Gateway CEO, Ted Waitt, explained to an AMD executive that Intel offered him large monetary inducements not to deal with AMD – which he could not refuse: "I have to find a way back to profitability. If by dropping you, I become profitable, that is what I will do." Shortly thereafter, Gateway stopped purchasing from AMD and issued a press release announcing its Intel exclusivity. The announcement came within weeks of similar public announcements of Intel exclusivity by both IBM and Micron.

59.    **Supermicro.** Intel's exclusive dealing also extends to small, specialty OEMs, of which Supermicro is a good example. Supermicro, the preeminent system assembler for servers and other high-end computers, historically has followed the Dell strategy of never buying from AMD. This arrangement foreclosed AMD from a large

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1   part of the approximately one-fifth of the server sector not controlled by the Tier One

2   OEMs. Following two years of negotiation, Supermicro, in 2004, finally agreed to

3   begin developing an Opteron-powered server; however. Supermicro so feared

4   retaliation by Intel relating thereto that it secretly moved the AMD development to

5   quarters behind Supermicro's main manufacturing facility. Further, Supermicro

6   forbade AMD from publicizing the product or beginning any marketing prior to its

7   actual release. When, in April 2005, Supermicro finally broke away from years of Intel

8   exclusivity, it restricted distribution of its newly-released Opteron-powered product to

9   only sixty of its customers and promoted them with a glossy, upscale brochure devoid

10  of its name and labeled "secret and confidential."

11                  **b.    Product-line, Channel, or Geographic Restrictions**

12          60.    Intel has also bought more limited exclusivity from OEMs in order to

13  exclude AMD from the most profitable lines or from channels of distribution best

14  tailored to take advantage of AMD's price/performance advantage over Intel.

15          61.    In exchange for discriminatory discounts, subsidies or payments, for

16  example, Intel has largely foreclosed AMD from the lucrative commercial desktop

17  sector. Intel has focused on the major OEMs because, when IT executives from

18  Fortune 1000 companies purchase desktop computers, they look for a strong brand

19  on the box – Dell, IBM or HP. Knowing this, Intel has relentlessly fought to block the

20  introduction of an AMD-powered commercial desktop by the major OEMs who have

21  not ceded total exclusivity to Intel. What follows, again, are only representative

22  examples of Intel misconduct.

23          62.    **HP.** In 2002, when AMD set out to earn a place in HP's commercial

24  desktop product roadmap, HP demanded a $25 million quarterly fund to compensate

25  it for Intel's expected retaliation. Eager to break into the commercial market, and to

26  earn a place in HP's successful "Evo" product line, AMD agreed instead to provide

27  HP with the first million microprocessors for free in an effort to overcome Intel's

28  financial hold over HP. On the eve of the launch, HP disclosed its plan to Intel, which

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1   told HP it considered AMD's entry into HP's commercial line a "Richter 10" event. It

2   immediately pressured HP into: (a) withdrawing the AMD offering from its premier

3   "Evo" brand; and (b) withholding the AMD-powered computer from HP's network of

4   independent value-added resellers, HP's principal point of access to small business

5   users for whom the computer was designed in the first place. Intel went so far as to

6   pressure HP's senior management to consider firing the HP executive who

7   spearheaded the AMD commercial desktop proposal. As a result of Intel's coercion,

8   the HP-AMD desktop offering was dead on arrival. HP ended up taking only 160,000

9   of the million microprocessors AMD offered for free. As of today, HP's AMD-equipped

10  commercial desktops remain channel-restricted, and AMD's share of this business

11  remains insignificant.

12       63.    Intel also purchased HP's exclusivity for its most popular notebook line.

13  HP captured 15% of the U.S. retail market last Christmas with an Intel-powered 14.1"

14  display notebook (the "DV 1000") with a popular power-saving feature called Quick

15  Play. When AMD sought to convince HP to carry a similar AMD-powered notebook,

16  HP declined. It explained that Intel had paid between $3 and $4 million to lock up this

17  product line for at least one year.

18       64.    **Gateway.** After Gateway's 2004 merger with eMachines, AMD

19  attempted to revive the relationship it had enjoyed with Gateway until 2001, but

20  experienced extremely limited success. While Gateway built one AMD-powered

21  desktop model at the request of Circuit City, AMD remains locked out entirely of

22  Gateway's direct internet sales, its commercial offerings and its server line.

23  According to Gateway executives, their Company has paid a high price for even its

24  limited AMD dealings. They claim that Intel has beaten them into "guacamole" in

25  retaliation for those limited dealings.

26       65.    **IBM.** AMD and IBM began negotiations in August 2000 over a proposed

27  commercial PC business partnership. After seven months and with a deal nearing

28  completion, Intel approached IBM with an incentive-based program under which Intel

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

would become IBM's "preferred supplier" for processors in commercial products. "Preferred" meant exclusive. IBM accepted Intel's proposal and terminated discussions with AMD. In return for that exclusivity, according to IBM executive Ed Thum, Intel paid IBM "millions of dollars in market development funds."

66.    Intel also acted to thwart AMD efforts to partner with IBM on servers. Although IBM joined AMD as a launch partner when it introduced its Opteron 64-bit server chip in April 2003 – signaling to the industry and IT professionals its confidence in the product — Intel soon dissuaded IBM from aggressively marketing Opteron servers. After investing heavily in its design, IBM consigned its one Opteron computer model to a single target market segment (High Performance and Technical Computing). This was done, according to an industry report (confirmed by an IBM executive), because Intel paid IBM to shelve any further Opteron development. IBM also took Intel money in 2004 to scrap plans for a multiple-microprocessor Opteron server it had already designed and previewed with customers.

67.    Intel has also purchased IBM exclusivity in its "ThinkCentre" line of commercial desktops. When AMD pressed IBM to add an Athlon 64 model to its "ThinkCentre" roadmap, IBM executives explained that the move would cost them important Intel subsidies, and they thus declined to do so.

68.    **Fujitsu.** In 2002, Fujitsu and AMD formed an alliance to develop a low-power commercial notebook (FMV Lifebook MG Series) scheduled to go to market in the first quarter of 2001 which AMD spent over 20 million yen designing. Shortly before the launch. Fujitsu told AMD that Intel would not allow it to launch an AMD-powered commercial notebook, and the project died. To this day. AMD remains locked out of Fujitsu's commercial notebook lines. Intel's exclusionary conduct with Fujitsu extends beyond commercial notebooks. In the consumer space, for example, Intel purchased total exclusivity for Fujitsu's FM-Biblo NB consumer notebook line. When AMD tried to break Intel's lock on Fujitsu notebooks by offering to match any Intel discount, Fujitsu made clear that there was no price AMD could pay because

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1  Intel simply would not allow it. To this day. AMD remains locked out of Fujitsu's Biblo
2  line.

3      69.  Fujitsu-Siemens. Fujitsu-Siemens, a European joint-venture, was once
4  a mainstay for AMD's desktop business, with AMD chips powering over 30% of
5  Fujitsu-Siemens' offerings in the consumer sector. In early 2003, Intel offered Fujitsu-
6  Siemens a "special discount" on Celeron processors which Fujitsu-Siemens accepted
7  in exchange for hiding its AMD computers on its website and removing all references
8  to commercial AMD-powered products in the company's retail catalog.

9      70.  Intel has also succeeded in convincing Fujitsu-Siemens to impose
10 market restrictions on its AMD-powered PCs. Its parent, Fujitsu, currently sells an
11 AMD-equipped Lifebook S2010, a commercial notebook, but only in the U.S. and
12 Japan. Fujitsu-Siemens has declined AMD's plea to offer the machine in the
13 European market as well. Similarly, Fujitsu-Siemens designed for the European
14 market the FMC Lifebook MG Series notebook. Fujitsu-Siemens, however, refused to
15 offer that computer in Asia or North America. Finally, although Fujitsu-Siemens
16 produces an AMD commercial desktop – the Scenico – it refuses to advertise it on its
17 website, offering it instead only as a build-to-order product. Having invested
18 significantly to bring these computers to market, Fujitsu-Siemens has been able to
19 offer no explanation for its refusal to exploit them worldwide. AMD's unit share of
20 Fujitsu-Siemens' business recently fell below 30% for the first time in four years.

21     71.  NEC. Intel was forced to relax its hold on NEC's business when long-
22 time NEC customer, Honda Motor Company, demanded that NEC supply it with
23 servers powered by AMD's Opteron microprocessors. After underwriting the
24 considerable expenses of designing and manufacturing an Opteron server for Honda,
25 NEC then inexplicably refused to market the product to any of is other customers.

26     72.  There is no reason, other than Intel's chokehold on the OEMs, for AMD's
27 inability to exploit its products in important sectors, particularly commercial desktops.
28 These computers, which large corporate customers buy in the tens of thousands at a

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1   time, represent a lucrative opportunity for the supplier.  Yet, the microprocessors that

2   power them are identical to microprocessors in consumer computers, a sector in

3   which AMD has won both praise and market share.  The only material difference

4   between the consumer and commercial segments is that many more system builders

5   supply desktops to consumers, making it more difficult for Intel to control their

6   microprocessor choice.

c.    Exclusionary Rebates

7   73.    Intel has also imposed on OEMs a system of "first dollar" rebates that

8   have the practical and intended effect of creating exclusive or near-exclusive dealing

9   arrangements and artificially foreclosing AMD from competing for a meaningful share

10  of the market.

11  74.    In general, the rebate schemes operate as follows:  quarterly, Intel

12  unilaterally establishes for each of its customers a target level of purchases of Intel

13  microprocessors.  If the customer achieves the target, it is entitled to a rebate on all of

14  the quarter's purchases of microprocessors -- back to the very first one -- generally in

15  the neighborhood of 8-10% of the price paid.  Intel provides the rebate in cash at the

16  quarter's close.  OEMs operate on razor-thin margins, so qualifying for an Intel rebate

17  frequently means the difference between reporting a profit or a loss in the coming --

18  and closely watched -- quarterly earnings.

19  75.    In contrast to "volume discounts" that sellers offer on a graduated and

20  non-discriminatory basis to reflect cost efficiencies that accrue when dealing in larger

21  quantities, Intel's is a system of "penetration" or "loyalty" rebates designed to exclude

22  AMD from a substantial portion of the market.  Intel intentionally sets a rebate trigger

23  at a level of purchases it knows to constitute a dominant percentage of a customer's

24  needs.  Intel is able to develop discriminatory, customer-by-customer unit or dollar

25  targets that lock that percentage (without ever referencing it) because industry

26  publications accurately forecast and track anticipated sales and because OEM market

27  ///

1    shares -- which industry publications also report weekly, monthly and quarterly -- do

2    not change significantly quarter to quarter.

3        76.    Intel's retroactive discounts can operate to price microprocessors in such

4    a manner so that its competitors suffer a competitive disadvantage they cannot

5    overcome.

6        77.    At least in the short run, most if not all of the major OEMs must engage

7    significantly with Intel: (a) because AMD is too small to service all their needs while

8    continuing to satisfy other customer demand; (b) because to meet customer

9    expectations, OEMs must assure commercial computer buyers that specifications,

10    including the microprocessor, will remain unchanged during the product's lifecycle;

11    and (c) because Intel has encouraged end-users to specify that processors be of the

12    same family among similar computers in one installation, as this is perceived to

13    increase reliability (although technically this is not the case).

14        78.    Intel uses its retroactive discounts to make its large, captive market

15    share self-perpetuating. In any one quarter, Intel's competitors cannot economically

16    match Intel's retroactive rebate because they compete for too small a share of the

17    customer's volume over which to spread the dollars necessary to equal the

18    customer's total Intel cost savings. As a result, they lose the business and thus go

19    into the next selling cycle with Intel imbedded in additional customer product over

20    which Intel can spread its rebates. This serves again to artificially constrain

21    competitors' opportunity to match Intel's ensuing round of retroactive discounts.

22    Intel's inter-temporal leveraging of its market share effectively forecloses competitors

23    from ever having a fair opportunity to compete.

24        79.    Intel exacts a severe penalty from OEMs who fail to meet their targets.

25    For example, during the fourth quarter of 2004, AMD succeeded in getting on the HP

26    retail roadmap for mobile computers, and its products sold very well, helping AMD

27    capture nearly 60% of HP's U.S. retail sales for the quarter. Intel responded by

28    withholding HP's fourth quarter rebate check and refusing to waive HP's failure to

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1  achieve its targeted rebate goal. Instead, Intel "allowed" HP to make up the shortfall
2  in succeeding quarters when HP promised Intel at least 90% of HP's mainstream
3  retail business.

4      80.    Intel has deployed a variety of variants of this basic rebate scheme. In
5  the case of one European OEM, for example, Intel imposes the additional condition
6  that the customer purchase target volumes of specific processors, generally
7  microprocessors against which AMD's products compete particularly well. In the case
8  of another, Intel offers as an inducement discounted microprocessors rather than
9  rebates. In the case of the European division of one U.S. OEM, Intel has imposed a
10  target of between 70-90% of the customer's requirements. Rather than qualifying the
11  customer for a cash rebate, however, meeting the target entitles the OEM to
12  purchase designated processors at up to 20% below "normal" cost, thereby enabling
13  the customer to obtain favorable pricing on bundled products (e.g., a Centrino-series
14  processor and chipset) and/or to receive product offerings not available to
15  competitors.

16      81.    Intel makes similar offers to smaller OEMs but they are generally
17  unwritten, and Intel leaves undefined the consequences of failing to meet a target.
18  Thus, a customer falls short at its peril, knowing only that it may lose its account with
19  Intel and have to source future products from Intel distributors, which is both more
20  expensive and provides less security of supply than direct purchase.

21      82.    The salient features of all of Intel's rebate schemes are that they are
22  discriminatory and market-foreclosing. If the customer chooses to purchase any
23  significant quantity of microprocessors from one of Intel's competitors, it will not
24  qualify for its rebate, and its price will be higher on all the Intel processors it buys
25  across the board. By tailoring targets to each customer's size and anticipated
26  volume, Intel locks up significant percentages of the market much more effectively
27  and at a lesser cost to itself -- but to a greater harm to Intel's competitors and
28  / / /

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

-27-

1  ultimately consumers -- as compared to offering such rebates for comparable

2  purchase levels to all customers an a nondiscriminatory basis.

3      83.    Intel's use of retroactive rebates leads, in some cases, to below-cost

4  pricing on incremental sales. The following example shows why a customer's

5  incremental cost of purchasing from Intel those units that both Intel and a competitor

6  could supply (the "contested sales") can be zero or even negative -- a price the

7  competitor cannot match. Consider an OEM which has purchased 90 units of

8  Microprocessor A at $100 per unit under an Intel rebate scheme that entitles it to a

9  10% first-dollar discount but only after it purchases more than 90 units. Its cost for

10 the 90 processors is $9,000. The OEM is now considering an additional purchase of

11 a further 10 units. If it makes the additional purchase from Intel, the OEM will meet

12 the expenditure condition and will qualify for the 10% per unit discount on all units.

13 Accordingly, the total spent will remain $9,000. The incremental cost of the 10

14 additional microprocessors — as well as Intel's incremental revenue will be zero (the

15 $1,001) additionally spent, less the $1,000 thereby saved). In other words, this

16 scheme leads to incremental units being offered to the OEMs for nothing, leaving the

17 competitor hopelessly boxed out.

18     84.    Importantly, even if Intel were to earn some incremental revenue on

19 these marginal units, these additional revenues could be below the incremental cost

20 of their production. As a result, Intel's additional profit on the sale would be negative,

21 but far the fact that it had a long-run exclusionary effect on competitors. (Obviously, if

22 Intel earns no revenues on its additional sales, it has to be foregoing profits.) As this

23 analysis shows, some of Intel's discriminatory, retroactive rebates amount to unlawful,

24 predatory below-cost pricing.

25     85.    Even where Intel's prices are above cost on the incremental volumes

26 and overall despite its retroactive rebate schemes, these rebates enable Intel to lower

27 prices selectively in the contested market segment while maintaining higher prices in

28 its captive market.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

86.    For example, Intel can offer rebates which are granted across the entire volume of sales but which are triggered only if the OEM increases its purchases beyond the portion of its requirements which is captive to Intel. Indeed, Intel can even price above the "monopoly" level for the volumes below the benchmark and offer huge discounts for additional purchases knowing full well that the OEM will not buy less than the benchmark and, instead, source the overwhelming share of its purchases from Intel thereby "qualifying" for the putative rebate while at the same time denying AMD any reasonable volume opportunity.

87.    The use of retroactive rebates to limit competitors to a small share of an OEM's business heightens the obstacles to inducing the OEM to launch platforms powered by microprocessors sold by Intel's competitors. OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it. Intel's rebate and other business strategies effectively cap the volumes of non-Intel processor-powered products that an OEM can sell. Hence, Intel's practices exacerbate normal impediments to entry and expansion.

### d.    Threats of Retaliation

88.    Beyond exclusive dealing, product and channel restrictions and exclusionary rebates, Intel has resorted to old-fashioned threats, intimidation and "knee-capping" to deter OEMs from dealing with Intel's competitors. Intel has a variety of pressure points at its disposal: It can unilaterally reduce or withdraw a discount, rebate or subsidy; it can impose a discriminatory price increase on a disfavored customer, extend a price cut to that customer's competitor, or force retailers into dropping the customer's computers and buying from its competitor instead; or it can delay or dispute an allowance or rebate -- all of which can turn a profitable quarter for an OEM into an unprofitable one. Other pressure points on accounts it deems disloyal include threatening to delay or curtail supplies of scarce processors or essential technical information. Examples abound.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1    89.    As Gateway executives have recounted, Intel's threats beat them into

2    "guacamole." But Gateway is not alone. Prior to its merger with HP, Compaq

3    Computer received Intel threats every time it engaged with AMD. In late 2000, for

4    example, Compaq's CEO, Michael Capellas, disclosed that because of the volume of

5    business he had given to AMD, Intel withheld delivery of server chips that Compaq

6    desperately needed. Reporting that "he had a gun to his head," Capellas informed an

7    AMD executive that he had to stop buying AMD processors.

8    90.    In 2002, Intel targeted NEC. Intel threatened to discontinue providing

9    NEC with the technological roadmap of future Intel products if NEC did not convert its

10    entire line of Value Star L computers to Intel microprocessors. Without that roadmap,

11    NEC would be at a distinct competitive disadvantage. Predictably, NEC succumbed

12    and eliminated AMD from the Value Star L series in 2002 and 2003.

13    91.    AMD had been engaged in discussions with IBM about introducing an

14    Opteron "blade" server, when IBM suddenly announced that any such product it

15    distributed could not bear an IBM logo. When pressed for an explanation, IBM

16    reported that it could not appear overly supportive of AMD server products because it

17    feared retaliation from Intel.

18    **e.    Interference with AMD Product Launches**

19    92.    Key to gaining quick market acceptance of a new microprocessor is a

20    chipmaker's ability to develop a lineup of reputable launch partners, consisting of

21    OEMs prepared to roll out products featuring the chip, major customers who are

22    willing to buy and embrace it, and other industry allies, such as major software

23    vendors and infrastructure partners who can attest to its quality and reliability.

24    Particularly for commercial and enterprise (i.e., server-work station) purchasers, a

25    successful and impressive "launch" is essential to generating confidence among the

26    computer professionals who will be the potential audience for the new

27    microprocessor.

28    ///

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

93.    Aware of the importance of product launches, Intel has done its utmost to undermine AMD. Set forth below are several examples.

94.    AMD's September 23, 2003, launch of Athlon64 was a watershed event for the Company. Upon learning the launch schedule, Intel did its best to disrupt it. For example, Acer committed to support the AMD rollout by making a senior executive available for a videotaped endorsement and by timing the introduction of two computers, a desktop and a notebook, to coincide with AMD events planned for Cannes, San Francisco and Taiwan. Days before the event, Intel CEO, Craig Barrett, visited Acer's Chairman, CEO and President in Taiwan, expressed to them Intel's "concern" and said Acer would suffer "severe consequences" if it publicly supported AMD's launch. The Barrett visit coincided with an unexplained delay by Intel providing $15-20 million in market development funds owed to Acer. As a result, Acer withdrew from the launch in the U.S. and Taiwan, pulled promotional materials, banned AMD's use of the video, and delayed the announcement of its Athlon64-powered computers. Acer's President subsequently reported that the only thing different about Intel's threats was the messenger -- they were "usually done by lower ranking managers," not Intel's CEO.

95.    HP also withdrew precipitously from the Athlon64 launch after committing to participate. HP had agreed to support the launch by producing a promotional video and by sending senior executives to all three launch sites. Just before launch, however, HP manager, John Romano, pulled the video and announced that HP would only be sending a junior manager, and then only to Europe.

96.    Other AMD customers and channel partners reporting Intel coercion to withdraw from the Athlon64 launch were Lenovo, NEC-CI, and Best Buy.

97.    Intel also disrupted AMD's launch of its Opteron server chip, which was rolled out on April 22, 2003, with few in attendance and little industry support. A computer industry journal reported Intel's fingerprints: "They all (vendors) told me that prior to the launch, they received a phone call from Intel. Intel asked if they were

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1  going to the launch. If they replied yes, the Intel rep asked them if it was 'important to

2  them to go', or 'if they really wanted to go.' Pressing the vendors, I got the same

3  response, 'Intel is too smart to threaten us directly, but it was quite clear from that

4  phone call that we would be risking our various kickback money if we went'."

5       98.    Other companies that reported being intimidated from participating in the

6  Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens. Indeed, Intel

7  representatives told Fujitsu-Siemens' executives in the weeks preceding the Opteron

8  launch that if they attended, they would be the only Tier One OEM showing its

9  support as all of the others would back out. With the exception of IBM, Intel was right.

10       99.    These are not isolated examples. but rather illustrations of Intel's

11  relentless campaign to undermine marketing efforts by its one remaining competitor.

12  For example, IBM pulled its AMD-powered computers from the 2004 Palisades

13  eServer and PC Show, citing a contractual agreement with Intel said to prohibit it from

14  endorsing those competitive products. And at the 2004 Super Computing Show, an

15  annual conference devoted to high performance computing, Intel offered two other

16  AMD customers money to remove AMD systems from their booths. At CeBit, Intel

17  threatened to pull a half million dollars of support from Fujitsu-Siemens for displaying

18  AMD products (which were removed).

19             **f.    Product Bundling**

20       100.    Intel also uses product bundling as an exclusionary weapon in a variety

21  of ways. Intel's most common deployment is in bidding for a new OEM platform; it

22  bundles microprocessors with free (or heavily discounted) chipsets or motherboards,

23  often offered in amounts exceeding the OEM's requirements for the new platform.

24  (The excess, of course, is only compatible with Intel processors, thereby providing the

25  OEM a strong inducement to go with Intel rather than AMD on uncommitted models.).

26  AMD does not sell chipsets or motherboards; they are provided by independent

27  suppliers such as ATI, nVidia and Via which incur their own costs and control their

28  own pricing. Hence, to match Intel's bundled microprocessor-chipsets-motherboards

1  offer, AMD must extend a discount on its microprocessors that will not only match any
2  Intel discount on the microprocessors themselves but also will compensate the OEM
3  for the savings it will lose on independent Intel chipset and motherboard purchases.
4  The additional compensation AMD is forced to provide through a discount on the sale
5  of microprocessors alone makes AMD's sale of microprocessors potentially
6  unremunerative, and it also enables Intel to avoid competing with AMD directly on
7  microprocessor price and quality by imposing disproportionate burdens on AMD that
8  are wholly unrelated to AMD's product quality which, as has been demonstrated, is
9  frequently superior to that of Intel's.

10      101.    As retaliation for dealing with AMD, Intel has also used chipset pricing as
11  a bludgeon.  For example, in 2003, Acer had committed to launch the AMD Athlon
12  XP.  Acer executives worldwide had been working with AMD to bring the product to
13  market post-launch.  But, on the eve of the launch the Acer management in Taiwan
14  pulled the plug.  AMD learned from Acer executives that Intel had threatened to raise
15  chipset prices by $10 on all Intel-based Acer systems if any processor business was
16  awarded to AMD outside of Europe.

17      102.    Intel's dealings with OEMs are unlawfully exclusionary, have no pro-
18  competitive justification, and are intended to maintain its monopoly.

19          **2)    Practices Directed At Distributors**

20      103.    Intel uses many of the same tactics it practices on OEMs to restrict
21  distributors from carrying AMD processors or selling AMD products into markets it
22  deems strategic.  For example. it entered into an exclusive deal with Synnex, which is
23  one of the largest U.S. distributors.  Given Intel's 80% plus market share, there is no
24  pro-competitive justification for this arrangement.

25      104.    As with OEMs, Intel offers discounts and rebates to distributors on the
26  condition that they not do business with AMD.

27      105.    Intel also offers a panoply of special programs for distributors who carry
28  Intel microprocessors exclusively:  marketing bonuses, increased rebates, credit

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1  programs for new customers (credits that can be used for all products from Intel and
2  any other suppliers), payment for normal freight charges, and special inventory
3  assistance such as credits to offset inventory costs. When such nuanced means of
4  achieving exclusivity fail, Intel has simply bribed distributors not to do business with
5  AMD. For example, a high-ranking Tech Data executive turned down $1 million to
6  stop doing business with AMD, causing the Intel representatives to ask, "How much
7  would it take?"

8      106.   Intel also offers retroactive rebates triggered when a distributor reaches
9  a prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict
10  economic punishment on those who do too much business with AMD. Unlike OEM's
11  however, distributors remain ignorant of the goals Intel has set for them or the precise
12  consequences of failing to meet them. Intel does not share this information with
13  them; they simply receive a check at the end of a quarter. As a result, every AMD
14  chip they purchase, they buy at their peril.

15      107.   Finally, those distributors who choose to do business with AMD have
16  been conditioned to expect Intel retaliation. For example, when ASI, one of the
17  largest computer hardware and software distributors, began distributing AMD
18  processors, Intel demanded that it exclude AMD personnel from its ASI Technology
19  Shows and its General Managers' meetings. Until recently, ASI refused master
20  distributor status from AMD, despite the financial benefits attached, because it feared
21  that such a public alignment with AMD would trigger Intel retaliation. When, in
22  January 2005, it finally accepted Master Distributor status, Intel began reducing the
23  level of market development funds ASI received.

24      108.   Avnet Inc., one of the world's largest computer equipment distributors,
25  has also received its share of Intel intimidation. Thus, Avnet cited Intel as the reason
26  it could not distribute AMD parts to the industrial sector. And when AMD launched its
27  Opteron server chip, Intel made clear it would make it "painful" for Avnet were it to
28  begin distributing that chip. When Avnet did so anyway, Intel threatened to cut if off.

1    109.   Intel's dealings with distributors are unlawfully exclusionary, have no pro-

2    competitive justification, and are intended to maintain its monopoly.

3        **3)    Practices Directed At Retailers**

4    110.   In both the U.S. and internationally, approximately one fifth of desktop

5    and notebook computers are purchased at retail stores. A handful of retailers

6    dominate the U.S. PC market: Best Buy and Circuit City are the largest. Other

7    significant but smaller retailers are WalMart/Sam's Club, Staples, Office Depot, and

8    Office Max.

9    111.   Most of the PCs sold at retail are sold during four or five "buying

10   seasons" that correspond to events on the calendar ("Dads and Grads," "Back to

11   School," "Holiday," and the like), and retailers refresh their inventory for each of those

12   events. A chipmaker faces a two-step process to get its platform on retail shelves:

13   first, it must convince one or more OEMs to build machines using its microprocessor

14   at a suggested price point (called "getting on the roadmap"); and second, it must

15   convince the retailer to stock and devote shelf space to these machines. Shelf space

16   does not come for free.

17   112.   The major retailers demand market development funds ("MDF") in

18   exchange. MDF can consist of cooperative advertising support, but more frequently it

19   comprises a marketing-related opportunity that a chipmaker must buy for tens of

20   thousands of dollars, for example, space in a Sunday circular, an in-store display or

21   an Internet training opportunity with the chain's sales staff. The MLF required to

22   secure shelf space can run as high as $25 per box depending on the computer price

23   point and how urgently the competing chipmakers want the shelf space.

24   113.   Intel has historically enjoyed an advantage over AMD at retail because,

25   using many of the strategies described above, it has had greater access to the OEMs'

26   roadmaps and the ability to exert pressure to keep AMD out of their product plans.

27   Also, it has significantly greater financial resources with which to buy retail shelf

28   space.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

114. But to leverage those advantages, Intel has also made exclusive deals with many key retailers around the world. For example, until recently Office Depot declined to stock AMD powered notebooks regardless of the amount of MDF AMD offered, contending that to do so would put its "premier" status with Intel at risk. Fry's is Fujitsu's only retailer in the United States. When Intel learned that Fry's was very successfully marketing a Fujitsu's Athlon™ XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

115. AMD has nonetheless made some progress in gaining retail market share. Because of price/performance advantages, which are key in retail, OEMs build approximately 15% of their U.S. domestic market desktops with AMD processors; within notebook roadmaps, AMD represents approximately 10%. On a shelf space to sales basis, AMD has generally outperformed Intel. For instance, in the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33%-38% share of Circuit City's sales, despite being limited to five of the 25 models (20%) on the Circuit City shelves. And with approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD computers accounted for roughly 30% and 22% of their sales, respectively. These numbers confirm that AMD's products perform well at retail, provided that space is available.

116. In fact, Intel's sales staff was instructed "not to let this happen again." As a result, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect. Under this program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD-based products, but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% across all products.

117. This is how the program works at Circuit City. If less than 20% of Circuit City's notebook revenue derives from AMD-based computers (30% for desktops), Intel has agreed to pay Circuit City $15 in MDF per Intel-powered machine; but if the

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1  AMD percentage reaches or exceeds 20%, Circuit City's MDF subsidy is cut to $10.

2  This creates a $5 per box "tax" on the retailer for doing 20% or more of its dollar

3  volume with AMD-powered machines; and this "tax" is applicable to all of the Intel-

4  powered machines that the retailer buys, back to the very first machine.

5  118.  The following illustrates the competitive disadvantage this creates for

6  AMD: If Circuit City were to purchase only Intel-powered notebooks for its 200,000-

7  unit inventory in a quarter, Intel would pay it $15 of MDF per computer, or a total of $3

8  million. If Circuit City, however, were to reduce its purchase of Intel-based notebooks

9  to 80% (160,000 units) so that it could stock a modest number of AMD-powered

10  computers, Intel MDF would fall to $1.6 million ($10/MDF/unit times 160,000 units).

11  Were AMD to match Intel's $10 per unit MDF on the 40,000 units it supplied, Circuit

12  City would receive an additional $400,000, bringing its total MDF to $2 million, leaving

13  it $1 million worse off or doing business with AMD. For AMD to make Circuit City

14  "whole," it would have to vastly increase its MDF on its 20% share to $35 MDF per

15  unit (40,000 x $35 = $1.4M), which together with Intel's $1.6 million would bring the

16  total MDF back to $3 million. In other words, to just capture a 20% share, AMD must

17  offer two or three times as much MDF as Intel – because it has far fewer units over

18  which to spread the difference. Given those perverse economies, Circuit City is not

19  likely to allocate less than 80% of its notebook sales to Intel, even if it means taking

20  AMD stock off the shelves at the end of a quarter. (Indeed, to avoid inadvertently

21  running afoul of the limitation, a prudent distributor would keep AMD's share well

22  short of 20%.)

23  119.  Intel's dealings with retailers are unlawfully exclusionary, have no pro-

24  competitive justification, and are intended to maintain its monopoly at the expense of,

25  *inter alia*, Plaintiff and the members of the Class.

26  / / /

27  / / /

28  / / /

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

4)    Intel's Standard Setting and Other Technical Abuses

    a.    Intel's Exclusion of AMD from Industry Standards

120.   Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility. Indeed, standards are not only ubiquitous in the computer industry, they are essential. When a company is unfairly excluded from the standards-setting process or is denied timely access to the standard, however, competition can be restrained in a way that reverberates throughout the entire market. Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. Intel has also worked to deny AMD timely access to such standards. Its efforts have hampered AMD's ability to vigorously compete in the market.

121.   By way of example, Intel and AMD each develop and manufacture memory controller technologies that allow their processors and related components to communicate with memory. Intel designs and manufactures an entirely separate chip for this purpose, known as the Graphics and Memory Controller Hub, but AMD embeds its memory controllers directly into its processors, thus dispensing with the need for an extra chip and speeding up communication. Both companies need to know and have access to memory standards well in advance of producing their processors and/or chipsets so that their memory controller designs will be compatible with the next generation of memory devices.

122.   The Joint Electron Device Engineering Council ("JEDPC") is the industry organization responsible for the standards governing the most recent generations of computer memory chips. Even though JEDEC was already developing the standards for the next generation of memory chips, Intel convened a secret committee that it dubbed the Advanced DRAM Technology ("ADT") Consortium to develop a competing memory standard.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1    123.   The ADT Consortium was cleverly structured with multiple tiers of
2  membership, each with different levels of access to information. The majority of
3  companies were consigned to the lowest tier, meaning that they would receive access
4  to the memory standard only upon its completion, but not during its development.
5  The actual development effort was undertaken by companies with the highest tier
6  membership status, which Intel reserved for itself and the major memory
7  manufacturers. No other companies were allowed input or full access to the standard
8  during its development by the ADT Consortium.

9    124.   AMD desperately needed access to the developing standard, and input
10  into its definition, in order to be able to launch a microprocessor with updated memory
11  controller technology at the same time as Intel. AMD lobbied repeatedly for higher
12  tier membership status, but was continually turned down. Intel had structured the
13  ADT Consortium's rules to require a unanimous vote -- a rule that gave Intel veto
14  power -- over any decision to allow AMD to join the development committee; and it
15  used that veto power to cause the Consortium arbitrarily to reject AMD's application.

16    125.   By foreclosing AMD from input or access to the memory standard during
17  its development process, Intel deliberately placed AMD at a severe competitive
18  disadvantage. As a consequence of exclusion, AMD had no opportunity to monitor
19  participants' suggestions and to object to Intel proposed features that were without
20  substantial benefit to consumers and were instead motivated by Intel's desire to
21  disadvantage AMD's microprocessor architecture. Furthermore, by keeping the ADT
22  Consortium memory standard-setting process shrouded in secrecy, Intel was able to
23  gain a significant head start. While the ADT Consortium was ultimately unsuccessful
24  in implementing an industry standard, this type of exclusionary conduct exemplifies
25  Intel's attempts to use industry standard-setting to competitively disadvantage AMD in
26  an unlawfully exclusionary manner.

27    126.   Indeed, Intel is attempting a repeat performance with respect to a new
28  memory standard, this time excluding AMD by avoiding the open standard-setting

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1   committee entirely.  Intel is currently coercing the major memory producers into

2   signing non-disclosure agreements and working exclusively with Intel in a "secret"

3   committee to develop the next generation memory interface standard.  Once under

4   this agreement, the memory manufacturers are prohibited front sharing information

5   about their own product designs implementing the memory interface standard.  This

6   has the effect of preventing AMD from completing the design of its processor memory

7   controllers until Intel permits memory manufacturers to communicate their interface

8   specifications to the industry.

9        127.   By this scheme, Intel tightens its control over the industry by converting

10  what the component manufacturers intend as a public standard into a proprietary one,

11  and thereby guarantees itself an undeserved head-start and unfair competitive

12  advantage.

13           b.     Intel's Promotion of Industry Standards That
                    Disadvantage AMD.

14

15       128.   Even where it has been unable to exclude AMD from participating in the

16  development of industry standards, Intel has attempted to drive the adoption of

17  standards having no substantial consumer benefit and whose sole or dominant

18  purpose was to competitively disadvantage AMD based on its highly integrated

19  microprocessor architecture.

20       129.   As an example, 2004, JEDEC began developing standards governing

21  the design of the memory modules for next generation ("DDR3") memory devices.

22  These modules, known as dual inline memory modules, or "DIMMS," consisted of

23  printed circuit boards upon which a number of memory chips were mounted.  The

24  DIMMs connected the memory chips to the computer's motherboard through a series

25  of metal connectors known as "pins."  One purpose of the JEDEC standards was to

26  define the functions of these pins so as to enable chipmakers to design compatible

27  memory controllers that would allow their microprocessors and the memory on the

28  DIMMs to communicate.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1    130.   The JEDEC committee, which consists of members representing
2   companies throughout the computer industry, had already adopted a scheme for
3   defining the pins for the previous generation ("DDR2") DIMMs used in desktop and
4   laptop computers.  When the JEDEC committee began work on standards for DDR3
5   memory modules for desktop computer, Intel proposed that the committee adopt a pin
6   definition similar to that used for the DDR2 memory modules. This proposal made
7   perfect sense, as Intel explained to the committee, because it allowed DDR3 memory
8   controllers to be compatible with DDR2 and DDR3 memory modules.

9    131.   When the JEDEC committee began to define the pins for DDR3 laptop
10  memory modules in this consistent manner, however, Intel completely reversed its
11  position, counter-proposing instead that the committee rearrange the pin definitions.
12  Intel's proposal had no discernable technical merit or basis.

13    132.   In fact, Intel's motivation for proposing modification of the laptop memory
14  module pin definition was to competitively disadvantage AMD.  Any modification to
15  the laptop memory module pin definition would require Intel and AMD to make
16  corresponding modifications of their memory controllers.  AMD's microprocessor
17  design, while representing a huge breakthrough in integration, embeds the memory
18  controller directly into its microprocessor.  While this produces significant computing
19  advantages, modification of an embedded memory controller requires significantly
20  more time and expense.

21    133.   Knowing this vulnerability, Intel proposed its modified DDR3 memory
22  module pin definition for laptop computers for the purpose of delaying AMD's
23  introduction of a technologically superior part.  While Intel's proposal was ultimately
24  rejected by the JEDEC committee, confirming the proposal's complete lack of
25  technical merit, this is yet another example of how Intel has attempted to drive
26  industry standards to achieve its exclusionary ends.

27  / / /

28  / / /

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

c.    Intel's Leveraging of Its Other Product Lines to Unfairly Disadvantage AMD in the Marketplace

134.    Intel has also designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires sacrificing its own product quality and integrity.

135.    An example is Intel's compilers. Generally, independent software vendors ("ISVs") write software programs in high-level languages, such as C, C++, or Fortran. Before these programs can be understood by a computer system, they must be translated into object code -- a machine-readable language .-- by a software program called a compiler. Different companies write compilers for different operating systems (Windows, Linux, etc.) and for different programming languages (C, C++, Fortran, etc.). Intel offers compilers for use with a variety of different operating systems and programming languages.

136.    Intel's compilers are designed to perform specialized types of optimizations that are particularly advantageous for ISVs developing software programs that rely heavily upon floating point or vectorized mathematical calculations. Such programs include, for example, mathematical modeling, multimedia, and video game applications.

137.    Intel has designed its compiler purposely to degrade performance when a program is run on an AMD platform. To achieve this, Intel designed the compiler to compile code along several alternate code paths. Such paths are executed when the program runs on an Intel platform and others are executed when the program is operated on a computer with an AMD microprocessor. (The choice of code path is determined when the program is started, using a feature known as "CPUID" which identifies the computer's microprocessor.) By design, the code paths were not created equally. If the program detects a "Genuine Intel" microprocessor, it executes a fully optimized code path and operates with the maximum efficiency. However, if

/ / /

1  the program detects an "Authentic AMD" microprocessor, it executes a different code

2  path that will degrade the programs performance or cause it to crash.

3      138.  ISVs are forced to choose between Intel's compilers, which degrade the

4  performance of their software when operated with AMD microprocessors, or third-

5  party compilers, which do not contain Intel's particular optimizations.  Sadly for AMD

6  and its customers, for legitimate reasons Intel's compilers appeal to certain groups of

7  ISVs, especially those developing software programs that rely heavily on floating

8  point and vectorized math calculations. Unbeknownst to them, performance of their

9  programs is degraded when run on an AMD microprocessor not because of design

10  deficiencies on the part of AMD, but deviousness on the part of Intel.

11                    **EFFECTS OF INTEL'S MISCONDUCT**

12      139.  Intel's unlawful conduct has caused and continues to cause substantial

13  harm to competition in the market for x86 microprocessor chips. But for Intel's acts,

14  AMD and other competitors would be able to compete for microprocessor business

15  on competitive merits giving customers and end-product consumers lower prices,

16  enhanced innovation and greater freedom of choice.  As a result of Intel's conduct as

17  alleged herein, however, Plaintiff and the members of the Plaintiff Class have been

18  injured in their business or property and have been forced to pay supra-competitive

19  prices for x86 microprocessor chips and end-products and, suffered reduced

20  innovation and restricted choices in the x86 microprocessor market.

21          **TOLLING OF APPLICABLE STATUTES OF LIMITATION**

22      140.  Any applicable statues of limitation have been equitably tolled by

23  Defendant's affirmative acts of fraudulent concealment, suppression, and denial of

24  the true facts regarding the existence of the monopolistic and anti-competitive

25  practices at issue herein.  Thus, all applicable statutes of limitations should be tolled.

26  ///

27  ///

28  ///

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387